UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WILLIAM E. GREEN,

                Plaintiff,

                                                  1:15-cv-03611-PAC

      -against-

JACOB & COMPANY WATCHES, INC.,
D/B/A JACOB & CO., JACOB ARABO
an individual, and MG SECURITY               **AFFIDAVIT**
SERVICES, LLC

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK    }
                                }
COUNTY OF NEW YORK  }    ss.:

William Green, being duly sworn, deposes and says:

1. I am the plaintiff in the above entitled action and I am fully familiar with the facts and circumstances herein. I make this affidavit in opposition to the defendants motions to dismiss and in support of plaintiffs cross-motion to amend the complaint and extend time to serve if required.

2. Prior to being hired by MG Security Services, LLC ("MG") or Jacob & Company Watches, Inc., ("Jacob & Co."), I met personally with Jacob Arabo on or about December 2011. We discussed my background and employment history, and the duties that I would have as a security guard while working at Jacob & Co.. At the end of our meeting Jacob Arabo advised me that I was hired to work for Jacob & Co..

3. I had no previous employment with MG and was not advised that I was employed by MG until I was personally advised by Mr. Arabo that I was hired to work for Jacob & Co.

4. To my knowledge, I was the only individual that was personally interviewed and hired by Mr. Jacob Arabo to work at Jacob & Co..

5. When I was terminated by Mr. Gomez, I immediately asked him, "who did this come from" and I was advised that it came directly from Jacob Arabo. Mr. Gomez advised me that Jacob Arabo stated that I was not to return to the store anymore.

6. During my first meeting/interview with Mr. Arabo, Jacob advised me that I would be working in the Jacob & Co. store from Monday through Thursday.

7. Shortly after I began work at Jacob & Co., Jacob Arabo advised me that he wanted me to work on some additional/outside projects or assignments that would not be covered by MG's employment. This began approximately one month after I been working at Jacob & Co..

8. These additional/outside projects or assignments occurred not less than 10 times in each month for almost the full duration of my concurrent employment with Jacob & Co.

9. For these additional/outside projects or assignments, I was generally advised personally by Jacob Arabo or I would receive a telephone call from Jacob Arabo advising me of the additional/outside project (Jacob No.'s: 718-757-4505 Home; 917-991-3996 Cell; 516-441-7777 Cell; also via what's app text messages ). These additional/outside projects or assignments most often involved me working as a security guard for Jacob Arabo personally or on occasion as a security guard to look over various company merchandise that had been loaned or consigned to a celebrity or for an event. On other occasions I would receive a phone call from Jacob Arabo's personal driver Alfredo (Alfredo cell No. 917-972-2177). On some occasions Jacob Arabo would call me to request that I pick up his girl friend; sometimes to meet him at a restaurant to escort him to varies events/locations or to guard over he and a colleague/associate, either with him being present or not being present.  One of the common locations that Jacob Arabo would frequent that I would accompany him to was the Mandarin Hotel. Annexed and attached hereto are photographs of myself and Jacob with pop singing star Nelly; with Jacob and his wife at the Lincoln Center; or guarding company merchandise all of which occurred at one of these additional/outside projects or assignments.

10. There were occasions when Jacob Arabo would have meetings with different clients and people at hotels such as the Waldorf hotel or the Ritz Carlton.

11. The first instance of this additional/outside project or assignment was on or about January of 2011; Jacob Arabo approached me and asked to come home with him and to ride with him. After that it occurred quite regularly and frequently, receiving calls at various hours on my days off or evenings requesting that I meet him at some location to accompany him. We would usually stop by a restaurants, night clubs (The Boom Boom Room, Mary J. Blige's 40th birthday party, Metropolitan Opera, Lincoln Center, Denise Richard's charity event; we accompanied Valentino D. Carlotti to attended a tribute for Mr. Carlotti.

12. On somewhat regular occasions I would accompany Jacob Arabo to a bath house in the village. Mr. Jacob Arabo would bring his girlfriend to the bathhouse on a weekly basis and I would accompany him as his body guard. I also accompanied Jacob Arabo to a bar/nightclub called Land of Dreams Mexico; I accompanied him as his personal bodyguard/security guard on December 11, 2012 to a charity auction at the location; Mark Anthony was performing.

13. There was one occasion when I accompanied Jacob Arabo to the Ritz Carleton hotel and met with some foreign dignitaries from the middle east. I have photos of myself with the dignitaries security people.

14. On or about the Summer of 2011, Jacob Arabo personally handed to me business cards that he had ordered/prepared with my name on it. The business cards bore my name, the company address and the company logo, identify me as director of security. The only business cards that I ever handed out were the cards described herein above that Jacob Arabo had made for me and these cards were only handed out to customers at Jacob Arabo's direction. This was only done on those occasions when I would accompany Jacob Arabo on outside assignments. Unless I was directed by Jacob Arabo to hand someone one of my business cards, I did not distribute them. A copy of the business card is annexed and attached hereto as Exhibit B.

15. For some of the additional/outside projects or assignments, Jacob Arabo would personally request that I would depart the store to attend photo shoots on behalf of the store and watch over the company merchandise.

16. In all instances concerning the additional/outside projects or assignments, I would receive notice of the project/assignment from Jacob Arabo personally or from his driver Alfredo; there were no instances when there was any involvement of anyone from MG. In addition, Jacob Arabo personally paid me for these additional projects/assignments in cash; there was no instance in which I received any compensation for these additional projects from MG whatsoever. As I stated previously, these additional/outside projects continued for almost the full concurrent duration of my employment with Jacob & Co..

17. To my knowledge there were no complaints about addressing store customers/patrons improperly. However, I personally had several objections and complaints concerning Jacob Arabo's treatment of ethnic and minority individuals that were employed by Jacob & Co. directly or through MG. There were several occasions in which I witnessed unfair, disparate or discriminatory treatment/conduct by Jacob Arabo, his sister Lydia or his wife Angela. I noticed there were many instances where someone of color, particularly darker skin black people, were advised that they did not fit the image of Jacob & Co.. These workers were not treated the same as other non–minority employees but were spoken to in a condescending manner, and were asked to not locate themselves in a visible location within the store so that customers are patrons would see them.

18. As I am a person of African-American descent this troubled me, and within a few months of witnessing such conduct/behavior I spoke with Manny Gomez at MG. Sometimes I would speak with him while he was visiting Jacob & Co.; other times I would speak with him at the office of MG. On those occasions, Mr. Gomez advised that he recognized the disparity of treatment of some of the African-American employees, particularly when certain individuals would be sent to

the store by MG for employment and shortly thereafter advised that such dark skinned employees are not welcome. The most common phrase that I would hear within the confines of Jacob & Co. was that a dark skinned person "did not meet the image of Jacob & Co." on other occasions I heard Jacob Arabo's sister, Lydia, and his wife Angela, both employees in the store, complain about a dark skinned person being close to the entrance of the store, advising that "we should not have monkeys up front".

19. As I stated herein, I voiced these objections, concerns and complaints too Manny Gomez of MG on several occasions, but to my knowledge he did nothing about it and the conduct/behavior of treating dark skinned minorities in a disparate manner only continued.

20. Witnessing the frequency of what I considered to be improper/unlawful conduct and discrimination by the Jacob & Co. employees and owners made me very uncomfortable. I felt that such conduct and behavior was wrong and I did not appreciate that no one from MG was addressing it in any capacity. There came a period of time within approximately the last month of my employment, Jacob Arabo personally requested that I approach some of the dark skinned African-American employees and terminate their employment. These employees were good people, they worked well within the store and to my knowledge they were diligent and conscientious employees. The only thing that set them apart from the other employees within the store was the color of their skin, and I did not want to be involved in any manner with any scheme or artifice to discriminate against other African American employees.

21. Within the last month of my employment, Jacob Arabo requested that I approach Anthony Prelude, a dark skinned African-American co-worker, to advise him that he was to go home and tell him that he was not to return to the store for further employment. He also asked that I approach another employee "Rossa" a large man of Hispanic origin and also advise that he was to go home and not return.

22. I immediately expressed my concerns and objections about such actions to Jacob Arabo. I felt and advised him that such conduct, to terminate these people's employment, was based only upon the color of their skin and was racially motivated, as I had heard multiple comments about their not fitting the image of the store or referring to them as monkeys.

23. I told Jacob Arabo that such actions would be improper and I did not like and was uncomfortable being placed in a position where I was a party to such improper conduct/behavior. I advised him that the termination of these employees, along with another employee of dark skin, Mr. Vincent Dillard, was wrong.

24. Instead of sending the individual Rossa home, I located him to another area out of view of Arabo & his sister.

25. As concerns Mr. Prelude, I addressed my objections and concerns to an individual an employee of the store named Vadim; Vadim was the general manager at Jacob & Co, Lydia's son and Jacob Arabo's nephew; I advised him of my concerns about Anthony Prelude's employment and being advised that he did not fit the image of the store. Vadim advised me to advise Mr. Prelude return to the store and continue his employment. Mr. Prelude did return, however, he and I were both terminated a few days later. It is my understanding that the only reason for my termination was in retaliation for my speaking up and objecting to what I consider to be improper conduct and behavior by MG and/or Jacob & Co.

26. To my knowledge there were witnesses on some occasions when I would speak with Manny Gomez, including Ernest Palazzo, Greg Costan and Benjamin Gordon, complaining of the discriminatory behavior that went on in the store Jacob & Co.. I also addressed these concerns to the general manager of MG, Steven Gleeman.

The foregoing is affirmed under the penalties of perjury.

Dated: New York, NY
      February 1, 2016

                                                                                           __WILLIAM GREEN_____
                                                                                           William Green

Sworn to before me this 1st
day of February, 2016

    __NOTARY_____
Notary